Our final case today is 2017-1475 Arctic Cat v. Bombardier Recreational Mr. Lee, please proceed. Thank you, Your Honor. May it please the Court, my name is Bill Lee, and together with my colleagues, Louis Tompros and Michelle Sandoz, we represent PRP. If time permits, and with the panel's permission, I would like to focus my argument on three issues today. Objection threes. Go ahead, Mr. Lee. The three are obviousness, marking, and damages. You have a minute and a half, and then we start. So the first of the three would be our contention that the asserted claims are obvious. There is no dispute on this record that the combination of the challenger throttle reapplication system and the prior personal watercraft disclosed each and every element of the claims. There is also no dispute that that same prior art expressly and precisely disclosed this combination and suggested this combination to solve the very problem identified in the balance. That would render these claims obvious under CAOS 5. The second issue is the marking issue, where the District Court imposed upon the defendant the burden of proving marking compliance. The error alone is significant. It has the $30 million effect on the judgment by itself. And lastly, on the issue of damages, Mr. Braddock was permitted to offer an opinion based upon a different product introduced at a different time with a different value. It was economically, technologically, and temporally not comparable to the accused feature. So let me go directly to obviousness. This case is the unusual case where the prior art identifies the problem to be solved, the same prior art discloses each and every element of the claims, and the same prior art expressly states that you should combine these two pieces of prior art to solve that problem. So let me go to the first part. There are multiple combinations that would render these claims fully disclosed and invalid. But there was no disputed trial that the combination of the GTX personal watercraft and Challenger's jet boat throttle reapplication system satisfied all the elements of the asserted claims, with two exceptions of dependent claims, which are really not in dispute on this appeal. In fact, the party stipulated that the GTX disclosed virtually every element of the asserted claims. Is it your view that the law requires a conclusion of obviousness if there is some reference that suggests the combination? Your Honor, I don't think that I would go that far and have that black and white a proposition. I think in a context where there is prior art that identifies a problem, which suggests the combination of two prior art references in this particular case, and suggests that you actually combine them to solve that purpose, it would render it obvious. Even if that prior art suggests that there might be all kinds of problems, what if that prior art discloses a lot of different combinations? Not one. Say it discloses 50 different combinations. Because, see, Mr. Lee, the concern I have is that the rule of law you're asking for in the chemical arts in particular could be disastrous. Because the chemical arts disclose lists of possible chemicals and excipients and suggest that maybe you could pick something from column A with something from column B. Now, I know we're not in the chemical arts. We're on jet skis. Everybody gets this technology. But the rule of law for obviousness would nonetheless be applicable across different areas. And I feel like you're asking me to conclude that because a piece of art says there's a motivation, the inquiry is at an end. No. And, Your Honor, that's why I would not go as far as to make the principle that dispositive for all purposes. Well, that's good. And I agree. I'm glad you were able to point that far. And I don't think we need to even go close to that far. Because in this specific case, the SAE reports, which are prior art, which the jury was instructed disclose each and every element except for that disclosed by the challenger reapplication system. Those reports actually say three critical things. They say, first, combine the reapplication system with personal watercraft. But they also say, after having examined the question, the problem that we're trying to solve, there are four possible solutions. So you're correct in the life sciences area or in the chemical area where you could take a chemical formula and change a radical in literally hundreds of different ways. This is a circumstance where someone has to identify the problem. There is a request for a proposal from the Coast Guard, the Society of Automotive Engineers, and the specific subcommittee of the Society of Automotive Engineers dealing with watercraft says there are four solutions. And actually, in the interim report, it was rudders, scoops, throttle reapplication, and one other. By the time you get to the final report, it's three different types of rudders and throttle reapplication. So that would make it very different from the life sciences context where you could have multiple radicals. So I understand, Mr. Lee, that you're suggesting there should be one rule for obviousness in the chemical arts and perhaps other life science arts and a different rule for SCEDUs. Is that your position? No, I won't go that far either, Your Honor. I don't think there is a single rule, and it can be applied in the different arts, having in mind the different imperatives of the different arts. So to take Judge Moore's hypothetical, when you have a complicated chemical formula and you're talking about whether it's obvious to synthesize a new compound, there are an infinite number of different radicals you could choose, and there's a great deal of unpredictability. I take your point. That was sort of a teasing question. Let me follow up, however, on the presiding judge's implicit or explicit point.  Yes, Your Honor. This was a 10-day jury trial, right? Yes. It went on for 10 days. Your lawyers were up there, and their lawyers were up there, and they were going on for 10 days. My hypothetical is the following. Let's assume there's an appellate judge who willingly spends 10 days reading all the record in this case and reading all the briefs and comes to the conclusion that, you know, if I were on the jury, I'd probably have gone the other way and said, this looks like it could have been obvious to a posada at that point. And then the appellate judge is called upon to make a decision as to whether the jury verdict should be upheld. What advice would you give that appellate judge? Your Honor, I would give this advice to the appellate judge if I was asked. So the first thing is the fact that the appellate judge might have reached a different decision than any of the eight jurors or the eight jurors collectively is not enough to overturn the verdict, and we're not suggesting that it is. It's really irrelevant. It's irrelevant in the sense that it's not a basis for overturning the verdict. What is the basis, then, for overturning a jury verdict in this kind of a case after the jury had spent 10 days, hopefully not too painfully, listening to the description of how these machines work and you turn the knobs and the wheels and all the rest of it? Your Honor, it's the reason that we have JM Oil and Appeal, and there are two bases. Oh, and by the way, the judge was there too, right? Yes, yes. And how did the judge come out? The judge actually denied the JM Oil, which is exactly my answer to your question, which is there are two questions or two different questions on appeal that results from the verdict and the judge's ruling. And the first is whether there is substantial evidence to support the verdict of non-obviousness. And the second is, under KSR, the independent evaluation as a matter of law that the court undertakes. Both the district court judge would undertake and this court would undertake de novo. And notwithstanding the 10 days, respectfully, this is the advice I would give to the district court judge. If you focus on just five pages. We're not talking about a district court judge. The court of appeals judge. We're talking about a telecourt judge who has also listened to the district court judge, as you did. And I would, in this particular case, say the following. If you focus on no more than five pages in this record, 83539-40, which is the jury instruction where the district court judge, who was there, instructed the jury that in four different pieces of prior art, virtually every element of the claims was disclosed. The second is A8849, which is the challenger manual, which says in a single paragraph what's missing. Well, there's no doubt that the appellate judge would have voted for you. There's no doubt about that. But, Your Honor, I think. But that's not the issue. You yourself said that's not the issue. But, Your Honor, if the appellate judge would have voted for us as a juror, I think that that's irrelevant. On the other hand, if the appellate judge focuses on the undisputed facts that compel, we suggest, a determination of non-obviousness, that then says there's not substantial evidence for independent lay. This is a problem. You want us to focus only on the facts that help your case. But on appeal, there are presumably a lot of jury fact findings in favor of obviousness here that I have to review for substantial evidence. And so that's not a matter of just looking at the facts that you point to that are the strongest for your case. It's looking at the facts that go the other way and saying they don't rise to the level of substantial evidence. Your Honor, I couldn't agree more. You started your conversation, Mr. Splager, with you only have to look at five pages of this record. That's what you said to him. But, Your Honor. And that is a radically improper way for an appellate court to review a jury verdict. Your Honor, I wasn't suggesting that you would look at any of the remaining portions of the record that were cited to you. But given that the obligation of the district court judge was to decide as a matter of review whether there was substantial evidence, given also that the district court judge had the obligation to determine de novo whether it was obvious as a matter of law, we can focus first on what the undisputed facts are. And then you can put in context anything else that they would like to offer. And if you focus on these, there is a jury charge that says virtually every element is satisfied. There is the undisputed evidence. The challenger satisfies remaining limitation. And, Your Honor, the challenger on the remaining limitation operates exactly the same as the accused feature. How do you respond to some of the other evidence that was raised in the red brief? Like, for example, that the chief of the Coast Guard said it was one of the most impressive innovations. Or some of the testimony about from your own witness saying that the prototype was quite a surprise and things like that. Those are the kinds of things that concern me because I think it's a really hard issue, to be honest with you. But at the same time, there is some evidence here, including the fact that the SAE draft final report itself has some language that says, oh, there could be problems here. So let me answer that question. I owe you my rebuttal time, and I'd like to give two sentences on each of the other two issues before, and then reserve the remaining time if I could. On the statement by the Coast Guard, it's in a press release when the product was introduced. The question for the court, whether it's de novo or reviewing substantial evidence, is this on secondary considerations. There's no proof of copying. There was no proof of commercial success. There was a single license for $315,000. Wait, you've got long felt lead, and you've got praise. So don't tell me what you don't have. Deal with what you do have. This is your problem. Mr. Lee, you stand here all morning, and you're trying to tell me what helps your case. But in a substantial evidence standard, you've got to dispute what they actually had evidence of. And I was just about to dispute it. Yeah, but with your time running out, don't start with all the things that help you. Go to the heart of what hurts you. There are only two things. A press release that they issued, which is not the type of praise that would be a secondary consideration overcoming the obviousness case we presented. And the second thing is long felt need. But as I said, in response to Judge Plager's question, the challenger operates exactly the same as the fraud or reapplication system of OTAS. This solution to the problem had actually been developed 10 years before. So if I could just say two things. No, you can't. I would like you to talk about marking. That's the only other issue that I want to hear anything about from you right now since you're totally out of time. But I do want to hear about marking because that is a case of first impression for the court if we are to reach it. I think, Your Honor, there is a small set of discreet facts that we think are largely undisputed. So there is no dispute that no products were sold by the plaintiff marked with the path. There is no dispute that there was a license that was entered into with conduct. We know all the facts. We've read your facts. You're testing my patience. So get to the exact point of which of the two standards, minority or majority view, I'll call them, we ought to adopt, and whether the district court adopted either of them or erred and sort of came up with a third, and then tell me which one I should choose. The answer is we believe the majority view is the correct view, but it doesn't matter here. If you adopt the minority view or the majority view, we identified 14 Honda personal watercrafts. We offered testimony that if OTAS infringed, so did those. There was no evidence in response. But here's your problem. You've asked me, okay, say I agree with everything you just said. You've asked me for a reversal. I don't know how you get to a reversal when the district court adopted the rule of law it did adopt in summary judgment. Therefore, a trial goes forward with the expectation that the burden of proof is on you all, whether that's correct or not, probably not correct, but whether it's correct or not, the burden was placed on you all. You may be met your burden of production even if we do adopt that particular view by identifying these 14 things. But my problem is they were never on notice since the court adopted the rule of law it was choosing in summary judgment, and therefore they were never given an opportunity to put on evidence at trial. Why should they? If they don't have the burden of proof but you do, why in the world should they put in claim charts? So you've asked for a reversal, but I don't see how you can get anything more than a vacate and remand, even if I agree with everything you've argued about the law. So, Your Honor, just two points since I'm past my rebuttal time. First is this. Whether you adopt the minority view or the majority view, we suggest that we satisfied our burden of production or persuasion. On your point, there was an issue at summary judgment. The jury charge did not charge on this issue at all. Yes, but this has nothing to do with the jury charge. This has to do with whether they were put on notice that they would have the obligation to put forward evidence. If the judge has already announced in summary judgment, which he did very clearly, that you had the burden of producing claim charts on infringement, if you were going to try to allege that the Honda models, the 14 models that you identified, actually fell within the claims, once the judge has put that burden on you, how would it be fair to them for me to reverse in your favor, saying, well, you didn't put on the evidence to the jury? I mean, they were clearly of the belief, and I think rightly so, that you had the burden. Well, Your Honor, let me say two things. If it was that clear that we had the burden of proving both that there were personal watercrafts sold and that they were covered by the claims, then that is inconsistent with both the majority view and the minority view, and so the legal standard is wrong. Yes, but I accept that. My question is, if that is how I view what the court nonetheless did, then how could I possibly – and you've said that's what the court did, by the way. I agree. You argued to me that that's what the court did. So if I agree with that legal argument by you, how in the world can I give you the result you want, which is a reversal, when they never had an opportunity to put on evidence that for the first time in this litigation I'm going to make clear is their burden to do? Your Honor, what you say has logic to it, and at a minimum will require a vacatur. We would suggest this question of who had the burden was a live issue right up until the charging conference, which occurs after the evidence is in. Both of us had a chance to prove what we're going to prove as a matter of evidence. But under the logic Your Honor just articulated, what you would do is you would vacate and remand for a determination of whether they satisfied the burden. No, for a new trial on this issue and possibly even the opening of discovery, if it's my view, which you argued to me that the summary judgment motion makes it clear that the district court put the entire burden of proof, not even just the burden of production, on you all improperly. So if you win on that legal argument which you made to me, the only result that I can see that is proper is to vacate and remand and to order the court not only to conduct a new trial on marking, but also to possibly allow the introduction of evidence since this plaintiff was unaware that they would have this burden of producing evidence. So let me break down my answer into two parts. The first part of the answer to your question is yes, as a matter of logic, that's what you would do. I think the question of whether there was an opportunity to discover and make contentions about this issue before summary judgment is something that we would address with the district court, and at that point she would decide whether there was new discovery or not. But if the legal standard is incorrect, at a minimum there should be a new trial. Whether there would be new discovery, new evidence, would be something the district court would decide in light of Your Honor's ruling. Okay. Thank you, Mr. Lee. I think Mr. Lee said he'd be happy with your result. I don't think he suggested that, actually. But we will restore your rebuttal time. Thank you for answering our questions, Mr. Dragstaff. May it please the court, to avoid switching too many times, I will start with marking where we left off. And maybe I'll take that in reverse. I'll assume for a moment that they have the burden properly and address what they put in. What burden do you think they have? The original burden of production. Right. See, that part gets a little fuzzy in that district court summary judgment motion, where he seems, he or she, she seems to sometimes refer to it as a burden of production, sometimes burden of proof. It's my understanding burden of proof is the persuasion burden that ultimately stays at all times with you all. Is that your understanding as well? I think so. Okay. And so the only question is, who has the burden of initially coming forward? Is it the patentee, under one view, some district court judges, or is it the petitioner or the infringer who's challenging? That's right? That's my understanding. Okay. So let me try it backwards, just because I think it's easier to talk about what they provided, and then we'll talk about why we think they should have the burden of production. So what they provided, they cite four places. One of them is the license, so that wasn't really what's provided. But one is A2447-48, and the question was to their expert, were you asked to opine on whether the patents covered the Honda products? He says yes. And they say, what's your opinion? So we're waiting for him to say yes, the patents cover the Honda products. And he says, well, I, the Honda system is very similar to OTAS. Okay. So they had a chance to meet their burden. The guy said he was asked, do the patents cover Honda? And he says, no, it's similar to OTAS. In other words, Honda's similar, not the same as, but similar to BRP. So when they had a chance to get the opinion to meet that burden, they didn't meet it. Didn't they identify, I understand there was maybe 14 Honda sales that they identified? And you're saying that's not enough. It doesn't then shift the burden to you. The stipulation, as I understand it, said Honda sold these 14 products. Not those products were covered by the patents or anything like that. So it has to be more than just saying there's a third party that's selling products. They have to at least make an assertion. And our view is they have to make a prima facie case. They have to come forward to show where the elements are met. But they didn't even come forward. So they have to prepare the claim chart. Not necessarily a claim chart. Then what would it have to be? It would have to be an assertion that all elements were met, but it doesn't have to be as formal as a claim chart. It could be that the parties don't dispute. In a lot of cases, the parties don't dispute what is addressed, and so it might be one element that they deal with. Just like this, where it is disputed, then what would they have had to do? They might have to come forward with a, a chart would be one way to do it, but they would have to come forward with allegations sufficient to show if they were believed. They don't have to be believed. They don't have to win on it, obviously. We have to win at the end of the day. Why would they have to be the ones to show whether Honda was selling patented products when, in fact, you are the ones who would more likely to have that information about how the Honda products work, given that it was your licensee? Okay, two points. Nobody has ever said, and there is no evidence, that we would be more likely. What Dunlap says is that the patentee would be more likely to know about its own products. The reality is that a patentee does not necessarily know anything about what its licensee is doing. You see parties all the time where the patentee and the licensee are not friendly. I don't think anybody's ever, if you hear somebody talk about licensees as an opportunity, that's not the licensee saying it. It's a little different in this situation, isn't it? Since your client, as I understand it, isn't making the products? It may be different, but we're not partnering anyway. There's not a joint venture. In fact, if they actually would be practicing and having to pay, or if you have an ongoing royalty, the licensee would actually be friendlier with the defendant because the defendant is trying to kill the patent, and then the licensee wouldn't have to pay anymore. So I think the assumption that the Dunlap rule should control in the licensee context is off. There are points on both sides for it, but I don't think it controls it. I don't think I agree at all, and I don't know if what Judge Stoll was posing was a question or sort of a statement, but I think that she has the better of it with Dunlap. Very seldom do we see these upfront paid, fully paid licensing agreements that for such a small amount of money give a license to all of these patents and any other family patents, which is the ones that are at issue here, and say, and by the way, you have no obligation to mark anything. I would say this is not the normal licensing agreement that I've been exposed to in my history as a judge, but nonetheless, in the normal licensing agreement where the patentee is having an accounting by the licensee, because most licensing agreements are a pay-to-play kind of scenario, of course the patentee is better situated to know whether the product comes within the claims, because every single one they sell is going to result in direct money to the patentee. And what we do see here are a lot of disputes between licensees and patentees over whether particular models do or don't fall within claims and therefore require payment. So I mean, I don't think this licensing agreement is the norm, but if we're being asked to make a rule of law that applies in all patentee licensing arrangements, I think that what Judge Stoll suggested is probably the better rule of law, because I think I shouldn't create a special rule of law because you've got a weird license. So let me take that point, because I think that is a good point, that you're being asked to apply a rule that works in all cases. And it's the countervailing factor that I think trumps any Dunlap concern. And the countervailing factor is there's an asymmetry in proof of marking. I would have to prove marking across the board. I say across all products. They say, well, you'd only have to prove it for certain PWCs that have certain features. But if you're trying to do a rule across the board, a company like Intel with chips would have to identify everything. I'm sorry to interrupt you, but in this case that doesn't make sense. I understand your point, but at some point, so the accused infringer should have to do something, like identify 14 products, identify some limited universe that might not be marked, and then the burden shifts. Why wouldn't that work? It allays your concern, for sure. I think they have to at least identify products that aren't marked with an allegation that they actually infringe. And the identification of the 14 products did not have that allegation in them. And the question I read you from their expert does not have that allegation. But you're saying it's not fair to place the burden on the patent owner because there's such a large universe. But what if that universe has been narrowed? And here it has been narrowed, right? I would disagree that it has been narrowed. The list, there is no context for that list. The list says, here's 14 things that Honda generated. There's no agreement that that's all we have to come back on. They can say that here, but even in this case, there is no agreement that we've met our burden by just dealing with those 14. If you put the burden on us initially, there is no narrowing. What you have here is somebody who thought they had the burden. They made a list of 14. We say they didn't do enough because they never even asserted that those were infringing. They asserted that they were similar to their product. But if you don't have this rule, if you don't have a party that feels they have to put a list in, then they don't have to do anything. And there is no narrowing. And that's our point. But let's assume that we agree with your view of what the legal standard should be. They have a burden of production to come forward. Why haven't they met it? I mean, they identified 14 Honda jet skis that are all within the same general line that, I mean, I don't know what to possibly use this list for, but for a claim, because it follows directly afterwards, and they didn't mark any of these with either of these patent numbers. You're right that it doesn't say, and we have concluded after expert testimony that they infringe, you know, it doesn't say that last little part, but it says here are 14, and these 14 aren't marked with either of these patent numbers in suit. I would say they actually testified that they don't infringe. If you go to 2482, which Mr. Lee cited, they start with saying that there is no infringement, and then they say, but if we infringe, then they infringe. But the testimony was the Honda products don't infringe. And what they had here was they were trying to Wait a minute. No, that's such an alternative argument. That doesn't help you. I mean, the fact that they might say, look, what we actually think we're doing is like what Honda's doing, and since we say we don't infringe, we're also going to say they don't infringe. No, you can't have it both ways. If he loses on infringement, then you can't say, oh, therefore he also hasn't met his burden on marking because he didn't assert they infringed. He doesn't have to give up on infringement in order to assert that you failed to mark. That would not make any sense. That can't be the rule. If you look at the testimony, he also ends by saying, but I don't know. He admitted a lack of knowledge. They were trying to infringe, right? They said our products are like theirs. Then they're found to infringe. That's it. Our products are like theirs. Not our products would infringe for the same reason. I don't think it's fair to hold that statement against them when they were later found to infringe. But their statement isn't that the products are the same. They say our products are like theirs. They're hedging. They're trying to not admit they were hedging. If they had said, listen, these products by Honda do exactly what we're doing, so if we infringe, it's in. But what they're saying is they're similar, so they're hedging on that. I need to move you to obviousness because we have a limited number of minutes together, and I think it's really important. I understand your arguments on marking from the briefs, and if my colleagues want to return to that subject, they certainly can. But I personally would really like to see you move on to obviousness. I have a question for you on obviousness, actually. I understand we have to look and see whether there's substantial evidence to support the jury verdict, assuming that the jury has found all facts that are possible in your favor. But there's one part of KSR that has been troubling me, and so I want to read it to you and get your response to it. KSR says, when there is a design need or market pressure to solve a problem and there are a finite number of identified predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. And so I just wonder whether that makes it so the jury verdict here is not a reasonable one, given these kinds of statements in KSR, because here there is a finite. You've got that SAE report that has a finite number of solutions. I believe there's four. And then you get a patent on one of them. And so how do you respond to that? First, it says likely. We don't have to go too far with that. It says likely. So that's the easiest response. Number two, we disagree on the finite. I mean, all solutions are finite, but we disagree on the four. Number one, the jury could find there were more than four or that they could find that maybe there were four categories with many solutions under them. That's up to the jury to decide. That's a fact question. Well, in fact, didn't BRP's Mr. Plant testify that there were 17 separate off-throttle steering prototypes using various approaches? And they worked on them for years. That long time that they worked on them and worked out each one suggests that each one was a distinct solution and not that they're all just one-solution fins. Well, whether I agree whether they're distinct or all one or not isn't really even the answer, right? It's just whether the jury could have possibly come to that conclusion. Number, I don't know if we're on three or four, there was never testimony that there was a finite number of solutions. Nobody said this is it. And, in fact, if you look in our patent, examples one, two, three, and maybe four don't fit any of those solutions. They are throttle reapplication, but they don't practice our patent. The examples are you have the throttle and maybe you put some foam in so when you let go of the throttle it takes a little longer down at the bottom and then they graph how it kind of slows down more slowly. That doesn't infringe our patent. And that's throttle reapplication. So a lot of their obviousness case is to generalize our invention out to throttle reapplication. We're not all throttle reapplication. Not all off-throttle steering would infringe your patent. Exactly. And wasn't there also an internal BRP memo that was part of this file record before the jury that actually called itself a brainstorming memo and identified 32 separate ways to achieve off-throttle steering in this art? Yes. And then further on the KSR point, they say predictable. We think there is substantial evidence that the result here was not predictable because if you look at what was facing these people, both Breen, and we haven't even gotten to whether Breen can be testifying at all or provide any evidence for them, but if you look at Breen. Just so I know for timing purposes. Was Mr. Breen the one who said he was surprised? No, that was Simard. Both teams said surprised. He used the word surprised. Our team said surprised. Their team said surprised. And I would say that they are super skilled. They had Sam Spade on their team who Simard said knows everything about watercraft and was a racer of personal watercraft. So you have super skilled teams that are saying they were surprised. Can I just ask a timing question? The SAE report, I don't remember the date of it, but is the BRP brainstorming memo after the SAE report to your knowledge or before? Do you remember chronologically? Actually, I don't. That's why I'm asking. Before. The BRP memo is before. That's right. So if that's the case, though, maybe there were 32 things on the table, but then when SAE comes along, isn't it possible that those 32 get narrowed down to four? Or do you think that any of these 32 would fit within option four of the SAE memo? Okay, so let me hit that as well as I can. If you look at the SAE memo, they said, We sent out questionnaires to folks, and we're reporting on what we got back. So they're not saying that there's only four or that we've narrowed down to four. They're saying in response to the, I think, 30-some letters we sent out, we got these four back. So that's the context of the SAE. There's no context in there to say these are your solutions or this is your exhaustive list of solutions. Of course, we don't know whether the jury thought there were two four or 30, do we? Right. And there were plenty in front of them. There are more out there that I just identified from our patent. And I guess ultimately, if I understand your point, it would be that even within those four identified by the SAE report, there were lots of formulations within each of those four, some of which would infringe, some of which would not. Right. Like you can put the rudder under the boat. You can put the rudder on the back of the boat. Right? Right. And that was up to the jury. Okay. And this is an area that involves safety. You're putting something on a big boat onto a small boat. Everybody, the dynamics of the small boat, every factor that differs makes that small boat less safe. And then what you're doing is putting thrust onto that small boat without telling the driver. And I say that because it brings it closer to some of these pharma cases where you're trying to make a drug that doesn't kill people. And there's a teachings away or there's dissuasion because of dangers. And this is why the people, the low-skilled people in this field relative to pharma, would be dissuaded whether that's a teaching away, whether you say that's not a motivation to combine or whether you say that's not a reasonable expectation. And just going back to that finite point for just one more second, not trying to beat a dead horse, but I also remember testimony somewhere in the record, and I want to know if this is correct and if you can explain it to me, that you said they sent out letters and 30 or so people responded and contributed to this SAE report. Weren't there a bunch of companies that said we're not going to respond and the rationale given was we're not going to reveal our technology? I think that's accurate. And if you actually take that one step further, you look at the two parties here. This is a little bit like an interference if you want to bring in the Proto 14, which we think doesn't have to be brought in. But if it is brought in, their team was surprised that it succeeded too. But they made the Proto 14, covered their documents with confidential. Look in the report of the Proto 14, which we say doesn't say much, covered it in confidential. We invited the Coast Guard to come and look at it. We invited our competitors to come and look at it. We disclosed it in a patent application. If you're looking for a parallel to interference, we win the interference. We got the patent. Their work should not hurt us. It helps us. The PWCs typically are pretty similar in size. To each other. To each other. Do jet boats come in different sizes? They do, but I think all of them, or at least the evidence, was that there is a big difference between the smallest jet boat and a PWC. What's the size of a small jet boat? I think I'm going to say 12, 14 feet probably. Now, there are differences other than just size. Seating position, whether you're high or low, whether you're down in the boat, how wide the boat is, whether it's going to wobble. The throttle, whether you have to reach down for the throttle or whether it acts automatically. So there were numerous. The statement of the challenger boat had everything is just not accurate. Mr. Draxath, I think our time is at an end, but I would like to ask you if we were to reach the question of marking, can you just, and suppose that we were to adopt the view that the plaintiff bore the burden of coming forward or some burden, some important burden. Suppose we were to adopt that view. What do you think the correct result would be? You heard the discussion I had with Mr. Lee. Should it be vacate and remand, a new trial? What do you think the right result should be under those circumstances? I was taking some notes, but I think he said vacate and let the district court deal with it, and I think that's probably the best result. If he didn't say that, that's still what I say. Okay, very good. Thank you, Mr. Draxath. Mr. Lee, you have three minutes of rebuttal time. Your Honor, three quick points. On the question of marking, whether you adopt the minority view or the majority view as articulated by the district courts, none of them impose on the defendant the burden of coming up with claim charts. The minority view says it's the plaintiff's burden to prove that there are no licensed products out there that are not marked. The minority view says the defendant has to identify products that may be covered by the claim. Then the burden after that shifts to the patentee. Well, let me ask you about that, because if we end up in that space, then I want to know whether you've done enough here to satisfy that initial burden of production, and in fact I want to kind of crystallize in my mind what that burden would even look like for cases in general, because it can't just be that you say, well, for example, suppose Honda had 100 different models of Ski-Dos, and you said, we identify all 100 models of Ski-Dos, now you go prove that every one of them doesn't fall within the claim. That's not what you did. But I'm trying to think about, again, a rule of law that is going to make good sense in lots of cases. So tell me, if you don't mind, how you complied in this case and how exactly you think that rule should look so that it doesn't allow what I just suggested, which is the defendant to just point and say all of their products. Your Honor, I think there are four critical facts that— I'm trying to get better with age, at least. But I think there are four critical facts here. The fact that you have a license agreement that says you don't have to mark. The fact that you have a licensor who has affirmatively stipulated that they didn't mark. And then you have a defendant saying, here are 14 personal watercrafts. And as Your Honor said, if you look at the stipulation and then the manner in which the stipulation was incorporated in the jury instructions, it basically says license agreement, no obligation to mark, here are 14 Honda watercrafts. Next paragraph, there have been no steps taken to determine whether there are any licensed products out there. In that context, I think, under the minority view, the burden shifts back to them to say, no, those aren't covered by the patent. Is that in part because you think you identified a sufficiently limited number of products? Yes. As opposed to all models, and what if they had a gazillion models? Do you understand? I do. If we were to adopt the minority view, I don't want to effectively make it the majority view by saying all you need to do is point at the licensee and say all his products. Your Honor, I understand exactly the issue. I think there are circumstances where a licensor could enter into a license agreement that says you have an obligation to mark. I have an audit right to determine whether you have. And they've taken steps to do that. There are cases that suggest that that may be enough to discharge your obligation. That's why I start with the ---- But here, your stipulation, what you've submitted never expressly says that you all hold the belief that any of these 14 likely infringe. You didn't even say likely infringe or may well infringe. I think, unless I'm mistaken, I'm looking on pages 3540 and 3541. That's the assertion, isn't it? I mean, isn't that ---- Your Honor, that's correct. That's the instruction.  But 3540 and 4541, you see just those 14 products. It doesn't say anything at all about these products potentially falling within the claims of this patent. Your Honor, but the purpose of that stipulation, which is a fact that everybody agreed upon, and then at 2482, our infringement expert says ---- 2482? 2482. Our infringement expert testified at line 9. If you're going to find that, in fact, OTAS does infringe on the 545, then it looks to me like you would also say that the features of the Honda PwC also would infringe. So there was ---- you're correct. There is an additional piece of proof that was needed that wasn't stipulated to because the parties weren't going to agree to it. But it's in the evidence. I get it. It's in the evidence. But just so I know, so in formulating a test, if I were to adopt the minority view, do you think it would be right for the test to say you have to identify with some particularity products and at least assert that they likely ---- it's your view they likely infringe? Yeah. Something like that. I think you're right. I think there's an obligation not just to point to 1,000 products and say go find it. I think you have to make some good faith representation that here are the products that may be covered by the license. We believe they are. The burden shifts to them to prove. Now, I do think it's important that the license agreement here didn't impose an obligation to mark and there was no ---- Right. No, I get it. That's all part of the fact. Do you want to say anything about obviousness? Yes. One last ---- Before we leave the marking, let me ask you, does the fact that the license had a provision in it saying no obligation to mark, does that make this a special case to which whatever our general rule may be that this is a potential exception area? That provision in the license agreement is unusual and I think in the marking context, the fact that you affirmatively contract not to have an obligation to mark and then you have a licensor who affirmatively takes no effort to determine whether they're licensed products makes it a special case. I can imagine articulating a rule as Judge Moore did that would cover that situation. I can imagine describing it as a specific circumstance that would require the shifting burdens we've just described. It could be other. Okay. Going to obviousness. Last point on obviousness, go to Judge Stoll's question. On this question of obvious to try and finite alternatives, and I don't disagree with what Judge Moore said about what's in the record, just two points. The SAE reports were not talking about just any total reapplication system. They were talking about the challenger system, which is identical to the OTAS system. This wasn't a question of lots of alternatives out there. Yes, there were prototypes that were required to make it work. It's identical. It's identical in every material respect. And so there were a finite set of opportunities. Second point is to the chronology, which Judge Stoll and Judge Moore asked about. The SAE report comes out on August of 1999. The patent application is filed on November 1999. It's not a coincidence. There was no prototype from Ardicat until next year. The SAE report, which they're now suggesting, doesn't suggest all of the elements and suggests the precise combination is what led to this patent application two months later. Thank you. Thank you, Mr. Lee. I thank both counsel. The case is taken under submission. All rise. The honorable court is adjourned until tomorrow morning. It's 10 o'clock a.m.